# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
     Plaintiff,

          v.

IMPERIAL CHEMICAL INDUSTRIES,
(NEW YORK), LTD., *et al.*
     Defendants.

Case No. 1:20-mc-536
(Originally Civil Action No. 17-282)

## MOTION OF THE UNITED STATES TO
## TERMINATE A LEGACY ANTITRUST JUDGMENT

Plaintiff**,** United States of America ("United States"), moves to terminate the judgment in the above-captioned antitrust case pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. As explained in the accompanying United States' Memorandum of Law in Support of its Motion to Terminate a Legacy Antitrust Judgment, the United States has concluded that because of age and changed circumstances since its entry, this decades-old judgment no longer serves to protect competition. The United States gave the public notice and the opportunity to comment on its intent to seek termination of the judgment in the above-captioned case; it received no comments opposing termination. For these and other reasons explained in the accompanying memorandum, the United States requests that this judgment be terminated.

Respectfully submitted,

Dated: November 24, 2020

*/s/ Milosz Gudzowski*
Milosz Gudzowski
Trial Attorney
Antitrust Division
United States Department of Justice
26 Federal Plaza, Suite 3630
New York, NY 10278
Telephone:  (212) 824-1343
Facsimile:  (212) 335-8023
Email:      milosz.gudzowski@usdoj.gov

# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
     Plaintiff,

          v.

IMPERIAL CHEMICAL INDUSTRIES,
(NEW YORK), LTD., *et al.*
     Defendants.

Case No. 1:20-mc-536
(Originally Civil Action No. 17-282)

## THE UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION TO TERMINATE A LEGACY ANTITRUST JUDGMENT

Plaintiff, United States of America ("United States"), respectfully submits this memorandum of law in support of its motion to terminate the legacy antitrust judgment in the above-captioned antitrust case pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. The judgment was entered by this Court in 1942 and is nearly eighty years old. The United States has concluded that because of its age and changed circumstances since its entry, the judgment no longer serves to protect competition. The United States gave the public notice and the opportunity to comment on its intent to seek termination of this judgment; it received no comments opposing termination.[1] For this and other reasons explained below, the United States requests that the judgment be terminated.

---

[1] The Antitrust Division contacted the successor entity, Syngenta AG, for the corporate defendant regarding this motion, and the company had no objection to it. *See Declaration of Milosz Gudzowski.*

# I.    BACKGROUND

From 1890, when the antitrust laws were first enacted, until the late 1970s, the United States frequently sought entry of antitrust judgments whose terms never expired.[2]  Such perpetual judgments were the norm until 1979, when the Antitrust Division of the United States Department of Justice ("Antitrust Division") adopted the practice of including a ten-year term limit in nearly all of its antitrust judgments.  Perpetual judgments entered before the policy change, however, remain in effect indefinitely unless a court terminates them.  Although a defendant may move a court to terminate a perpetual judgment, few defendants have done so.  There are many possible reasons for this, including defendants may not have been willing to bear the costs and time resources to seek termination, defendants may have lost track of decades-old judgments, individual defendants may have passed away, or company defendants may have gone out of business.  As a result, hundreds of these legacy judgments remain open on the dockets of courts around the country.

The Antitrust Division's Judgment Termination Initiative seeks to review all of its outstanding perpetual antitrust judgments and, when appropriate, seek termination of legacy judgments.  The Antitrust Division described the initiative in a statement published in the Federal Register.[3]  In addition, the Antitrust Division established a website to keep the public informed of its efforts to terminate perpetual judgments that no longer serve to protect

---

[2] The primary antitrust laws are the Sherman Act, 15 U.S.C. §§ 1–7, and the Clayton Act, 15 U.S.C. §§ 12–27.  The judgment the United States seeks to terminate with this motion concerns violations of the Sherman Act.

[3] Department of Justice's Initiative to Seek Termination of Legacy Antitrust Judgments, 83 Fed. Reg. 19,837 (May 4, 2018), https://www.gpo.gov/fdsys/granule/FR-2018-05-04/2018-09461.

competition.[4]  The United States believes that outstanding perpetual antitrust judgments presumptively should be terminated; nevertheless, the Antitrust Division is examining each judgment to ensure that it is suitable for termination.  The Antitrust Division is giving the public notice of—and the opportunity to comment on—its intention to seek termination of perpetual judgments.

In brief, the process the United States is following to determine whether to move to terminate a perpetual antitrust judgment is as follows:

- The Antitrust Division reviews each perpetual judgment to determine whether it no longer serves to protect competition such that termination would be appropriate.

- If the Antitrust Division determines a judgment is suitable for termination, it posts the case name and the judgment on its public Judgment Termination Initiative website, https://www.justice.gov/atr/JudgmentTermination.

- The public is given the opportunity to comment on each proposed termination within thirty days of the date the case name and judgment are posted to the public website.

- Following review of any public comments received, the Antitrust Division determines whether the judgment still warrants termination; if so, the United States moves to terminate it.

The United States followed this process for the above-captioned judgment.[5]

The remainder of this motion is organized as follows:  Section II describes the Court's jurisdiction to terminate the judgment and the applicable legal standards for terminating the judgment.  Section III demonstrates that perpetual judgments rarely serve to protect competition and that those that are more than ten years old presumptively should be terminated.  Section III

---

[4] *Judgment Termination Initiative*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/atr/ JudgmentTermination.

[5] The United States followed this process to move almost 80 district courts to terminate legacy antitrust judgments.  To date, all districts considering these matters, including the Southern District of New York, have terminated legacy judgments upon motion, and no court has denied a motion to terminate.  *See infra.*

also discusses specific circumstances justifying termination.  Section IV concludes.  Exhibit A

attaches a copy of the judgment that the United States seeks to terminate with this motion.  A

proposed order terminating the judgment also accompanies this motion.

## II.   APPLICABLE LEGAL STANDARDS FOR TERMINATING THE JUDGMENT

This Court has jurisdiction and authority to terminate the judgment.  The judgment

provides that the Court retains jurisdiction.  *See* Exhibit A at pg. A4.  In addition, the Federal

Rules of Civil Procedure grant the Court authority to terminate the judgment.  According to

Rule 60(b)(5) and 60(b)(6), "[o]n motion and just terms, the court may relieve a party . . . from a

final judgment . . . (5) [when] applying it prospectively is no longer equitable; or (6) for any

other reason that justifies relief."[6]  Fed. R. Civ. P. 60(b)(5)–(6); *accord Frew ex rel. Frew v.*

*Hawkins*, 540 U.S. 431, 441 (2004) (explaining that Rule 60(b)(5) "encompasses the traditional

power of a court of equity to modify its decree in light of changed circumstances" and that

"district courts should apply a 'flexible standard' to the modification of consent decrees when a

significant change in facts or law warrants their amendment") (citation omitted); *see also United*

*States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995) ("[T]he power of a court to modify

or terminate a consent decree is, at bottom, guided by equitable considerations.").

---

[6] Although the Tunney Act governs the procedures for judicial approval of consent decrees filed by the Antitrust Division, by its terms, it is not applicable to consent decree termination proceedings.  Nevertheless, the Second Circuit has held that the Tunney Act can provide "useful guidance" to the court with respect to decree terminations.  *See United States v. American Cyanamid Co.*, 719 F.2d 558, 565 n.7 (2d Cir. 1983).  The Tunney Act does not require a court to conduct an evidentiary hearing, 15 U.S.C. § 16(e)(2).  As described in this memorandum, in light of the nearly eighty years that have passed since this Court entered this final judgment and the changed circumstances since its entry, the United States does not believe that it is necessary for this Court to make an extensive inquiry into the facts of this final judgment in order to terminate it under Fed. R. Civ. P. 60(b)(5) or (b)(6).

Where, as here, the United States seeks to terminate an antitrust judgment, the court, exercising judicial supervision, should approve a decree termination when the United States has provided a reasonable explanation to support the conclusion that termination is consistent with the public interest. *See United States v. International Business Machines Corp.*, 163 F.3d 737, 740 (2d Cir. 1998); *United States v. Loew's, Inc.*, 783 F. Supp. 211, 213 (S.D.N.Y. 1992); *United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 869–70 (S.D.N.Y. 1987); *see also United States v. Western Elec. Co.*, 900 F.2d 283, 307 (D.C. Cir. 1990) (a court should approve a termination "so long as the resulting array of rights and obligations is within the zone of settlements consonant with the public interest today"); *United States v. Western Elec. Co.*, 993 F.2d 1572, 1576-77 (D.C. Cir. 1993) (under "deferential" public interest test, a court should accept a consensual termination of decree restrictions that the United States "reasonably regarded as advancing the public interest;" it is "not up to the court to reject an agreed-on change simply because the proposal diverge[s] from its view of the public interest;" rather, a court "may reject an uncontested termination only if it has exceptional confidence that adverse antitrust consequences will result.").

The purposes behind the antitrust laws inform the meaning of the term "public interest." *Id*. This Court's "public interest determination must be based on the same analysis that [it] would use to evaluate the underlying violation" —whether the present marketplace "is such" that the antitrust violation alleged in the complaint would be unlikely to recur following the decree's termination. *IBM*, 163 F.3d at 740; *see also United States v. American Cyanamid Co.*, 719 F.2d 558 (2d Cir. 1983). That evaluation necessarily is "forward-looking and probabilistic . . . focused on the *likelihood* of a potential future violation, rather than the mere possibility of a violation." *IBM*, 163 F.3d at 742 (emphasis added). "[T]he Department of Justice has broad

4

discretion in controlling government antitrust litigation"; thus, "[a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government. . . ." *Loew's*, 783 F. Supp. at 214 (citation omitted); *see also United States v. Paramount, Inc., et. al*, 19 Misc. 544 (AT), 2020 WL 4573069 at *3 (S.D.N.Y. Aug. 7, 2020) (same principle). "This Court may not substitute its opinion or views" for the government's when "the government consents to the termination of a decree." *Loew's*, 783 F. Supp. at 214 (citation omitted).

In that regard, if the government reasonably explains why there is "no current need for" a decree, termination would serve "the public interest." *Id.* at 213–14 (quoting *N. Pac. Ry.* v. *United States*, 356 U.S. 1, 4 (1958)). In *Loew's*, for example, the Court reasoned that "in view of the changed environment in which the [40-year-old] Judgment now operates, there is no persuasive reason for maintaining the Judgment and subjecting Loews to restrictions that do not bind other" market participants. *Id.* at 215. Recently, the *Paramount* decision reiterated how changes in law and fact exhibit how termination is in the public interest: "Because changes in antitrust law and administration have diminished the importance of the Decrees' restrictions, while still providing protections that will keep the probability of future violations low, the Court finds that termination of the Decrees is in the public interest." *United States v. Paramount*, *Inc.*, *et. al*, 19 Misc. 544 (AT), 2020 WL 4573069 at *7 (S.D.N.Y. Aug. 7, 2020).

Given its jurisdiction and its authority, the Court may terminate a judgment for any reason that justifies relief, including that the judgment is no longer in the public interest and no longer serves its original purpose of protecting competition. This result is consistent with other courts' actions across the country when analyzing Judgment Termination Initiative motions.

5

Seventy-nine districts have terminated about 800 legacy judgments upon similar motion. The courts span all judicial districts and include other courts both within this District and within this Circuit. *See, e.g., United States v. The Wool Institute, Inc.*, Case No. 1:20-mc-00029-LGS (S.D.N.Y. Jan. 29, 2020) (terminating one judgment); *United States v. Robert E. Miller, Inc., et al.*, Case No. 1:20-mc-00020-GHW (S.D.N.Y. Jan. 14, 2020) (terminating one judgment); *United States v. A. Schrader's Son, Inc., et al.*, Case No. 1:19-mc-01438-PKC (E.D.N.Y. Jun. 24, 2019) (terminating 14 judgments); *United States v. Alden Paper Co., et al.*, Case No. 1:19-mc-00015-DNH (N.D.N.Y. Apr. 29, 2019) (terminating five judgments); *United States v. New Departure Manufacturing Co., et al.*, Case. No. 1:19-mc-00016-LJV (W.D.N.Y. Jun. 11, 2019) (terminating 12 judgments); *United States v. County National Bank of Bennington, et al.*, Case No. 5:19-mc-00032-gwc (D. Vt. Mar. 21, 2019) (terminating one judgment).

In reviewing legacy judgments that have been the subject of the United States' motions to terminate, courts have found termination to be in the public interest for a variety of reasons, including the age of the judgment, defendant's corporate status, changed circumstances over time in markets, and lack of need due to the judgment duplicating prohibitions established under current antitrust laws. *See, e.g., United States v. Paramount, Inc., et. al*, 19 Misc. 544 (AT), 2020 WL 4573069 at *7 (S.D.N.Y. Aug. 7, 2020) ("Antitrust laws, and their faithful enforcement, weigh in favor of the Court's finding that there is a low likelihood of a potential future violation absent the Decrees."); *United States v. Coal Dealers Association of California, et. al.,* Case No. 19-mc-80147-JST (N.D.CA. Jul. 19, 2019) (terminating thirty-seven judgments because of their age, lack of need due to the judgments duplicating prohibitions under current antitrust laws, and changed circumstances. Specifically, the court noted, "Given that this motion

6

seeks to terminate judgments entered between 120 and 32 years ago and that many of the affected entities no longer exist, the Court finds the government's public comment initiative provided adequate notice under the circumstances" and that service was not necessary); *United States v. Continental Grain Co.*, 1:70-CV-6733, 2019 WL 2323875 (E. D. Tex. May 30, 2019) (terminating judgment under FRCP 60(b)(5)); *United States v. Kahn's Bakery, Inc., et al.*, 3:75-cv-00106-RPM at *6 (W.D. Tex. Mar. 26, 2019) (terminating judgment because it "no longer serves to protect competition"); *United States v. Virgin Islands Gift and Fashion Shop Ass'n, Inc., et al.*, 3:69-cv-00295-CVG-RM at *5 (D.V.I. Jun. 11, 2019) (terminating judgments, in part, because the prohibition on price fixing is duplicative of the antitrust laws and the representation by the United States that a corporate defendant no longer exists); *United States v. Anheuser-Busch, et al.*, 1:60-cv-08906-KMM at *5 (S.D. Fla. Jul. 19, 2019) (terminating judgments, in part, because of the "changes in factual and legal landscape" since their entry).  Exhibit B contains the orders specifically cited above. Termination of the final judgment in this case is warranted for similar reasons as in these cases.

## III.   ARGUMENT

This nearly eighty-year-old judgment no longer serves to protect competition, and it is in the public interest to terminate it.  Under the provisions of the judgment, the sole corporate defendant, Imperial Chemical Industries, (New York), Ltd., was enjoined from price-fixing and maintaining resale prices for nitrogen fertilizer, soda nitrate, ammonium sulphate, or synthetic ammonia with any other producers or distributors of such products.  The Final Judgment contained, among other prohibitions, a perpetual injunction from engaging in any of these activities in the future, and from exchanging pricing and production information with the producers and distributors of these products.

It is appropriate to terminate this judgment because it no longer serves its original purpose of protecting competition.  The United States believes that this perpetual judgment presumptively should be terminated because its age alone suggests it no longer protects competition.  Other reasons, however, also weigh in favor termination, including that the judgment prohibits acts that the antitrust laws already prohibit.  Under such circumstances, the Court may terminate the judgment pursuant to Rule 60(b)(5) or (b)(6) of the Federal Rules of Civil Procedure.

### A.    The Judgment Presumptively Should Be Terminated Because of Its Age

Permanent antitrust injunctions rarely serve to protect competition.  The experience of the United States in enforcing the antitrust laws has shown that markets almost always evolve over time in response to competitive and technological changes.  These changes may make the prohibitions of decades-old judgments either irrelevant to, or inconsistent with, competition. These considerations, among others, led the Antitrust Division in 1979 to establish its policy of generally including in each judgment a term automatically terminating the judgment after no more than ten years.[7]  This judgment—which is nearly eighty-years-old—presumptively should be terminated for the reasons that led the Antitrust Division to adopt its 1979 policy of generally limiting judgments to a term of ten years.

### B.    The Judgment Is No Longer Needed to Protect Competition

In addition to age, other reasons weigh heavily in favor of terminating the judgment. Based on its examination, the Antitrust Division has determined that the judgment should be terminated for the following reasons:

---

[7] U.S. DEP'T OF JUSTICE, ANTITRUST DIVISION MANUAL at III-147 (5th ed. 2008), https://www.justice.gov/atr/division-manual.

- The judgment prohibits acts that the antitrust laws already prohibit, specifically price fixing. This prohibition amounts to little more than an admonition that the defendants must not violate the law. Absent such terms, the defendants still are deterred from violating the law by the possibility of imprisonment, significant criminal fines, and treble damages in private follow-on litigation; a mere admonition to not violate the law adds little additional deterrence. To the extent a judgment includes terms that do little to deter anticompetitive acts, it should be terminated.

- The individual defendants, Richard Fort and Michael Tate, are presumed to have passed away or retired. To the extent that defendants no longer exist, the related judgment serves no purpose and should be terminated.

Each of these reasons support the termination of this judgment.

### C. There Has Been No Public Opposition to Termination

The United States has provided adequate notice to the public regarding its intent to seek termination of the judgment. On April 25, 2018, the Antitrust Division issued a press release announcing its efforts to review and terminate legacy antitrust judgments, and noting that it would begin its efforts by proposing to terminate judgments entered by the federal district courts in Washington, D.C., and Alexandria, Virginia.[8] On July 5, 2019, the Antitrust Division listed the judgment in the above-captioned case on its public website, describing its intent to move to terminate the judgment.[9] The notice identified the case, linked to the judgment, and invited public comment. In the above-captioned case, however, the Division received no comments concerning the judgment.

---

[8] Press Release, Department of Justice, Department of Justice Announces Initiative to Terminate "Legacy" Antitrust Judgments, (April 25, 2018), https://www.justice.gov/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments.

[9] https://www.justice.gov/atr/JudgmentTermination, link titled "View Judgments Proposed for Termination in Southern District of New York."

**IV.   CONCLUSION**

For the foregoing reasons, the United States believes termination of the judgment in the above-captioned case is appropriate, and respectfully requests that the Court enter an order terminating it.

Respectfully submitted,

Dated: November 24, 2020

/s/ Milosz Gudzowski
Milosz Gudzowski
Trial Attorney
Antitrust Division
United States Department of Justice
26 Federal Plaza, Suite 3630
New York, NY 10278
Telephone:  (646) 541-7333
Facsimile:  (212) 335-8023
Email:        milosz.gudzowski@usdoj.gov

# EXHIBIT A

# Final Judgment

A1

IN THE DISTRICT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF NEW YORK.

UNITED STATES OF AMERICA, PLAINTIFF

vs.

IMPERIAL CHEMICAL INDUSTRIES (NEW YORK), LTD,
RICHARD FOET, MICHAEL TATE, DEFENDANTS.

Civil Action No. 17-282.

U.S. vs. IMPERIAL CHEMICAL INDUSTRIES, (NEW
YORK), LTD., ET AL.

FINAL JUDGMENT.

The complainant, United States of America, having
filed its complaint herein on Feb. 17, 1942; the de-
fendants having appeared and filed their answers to
such complaint denying the substantive allegations there-
of; all parties hereto by their attorneys herein having
severally consented to the entry of this final decree herein
without trial or adjudication of any issue of fact or law
herein and without admission by any party in respect
of any such issue;

Now, therefore, before any testimony has been taken
herein, and without trial or adjudication of any issue
of fact or law herein, and upon consent of all parties
hereto, it is hereby

ORDERED, ADJUDGED, AND DECREED as follows:

I

That the Court has jurisdiction of the subject-matter
and of all parties hereto; that the complaint states a
cause of action against the defendants under the Act
of Congress of July 2, 1890, entitled "An Act to Protect
Trade and Commerce Against Unlawful Restraints and
Monopolies" and the acts amendatory thereof and sup-
plemental thereto.

II

The term "Fertilizer Nitrogen" as used herein shall
mean nitrogen chemically combined with other elements
in substances intended for use as agricultural fertilizer
whether alone or in admixture with other materials.

III

The defendant Imperial Chemical Industries (New
York) Ltd., its successors, subsidiaries, officers or em-
ployees, or any of them, be and they hereby are en-
joined and restrained from agreeing, combining or
conspiring (a) with any mixed fertilizer manufacturer
or dealer in or by any agency or resale price mainte-
nance contract or agreement to fix, determine, maintain,

A2

or adhere to prices to be charged in the sale of fertilizer nitrogen and (b) with any producer or distributor of nitrate of soda, ammonium sulphate or synthetic ammonia solutions, or with any producer or distributor of any other fertilizer nitrogen:

1. To fix, determine, maintain or adhere or prices to be charged in the sale of fertilizer nitrogen by them to others;

2. To fix, determine, maintain or adhere to prices to be charged in the sale of any particular fertilizer nitrogen product by them to others in terms of the relationship of such prices to the prices of any other Nitrogen products;

3. To prevent and restrain the shipment and sale to, into, or from the United States and its territories and possessions of fertilizer nitrogen, except in connection with the prosecution of any legal proceedings against importation or exportation for violation of the laws of the United States;

4. To exchange information as to prices to be charged for fertilizer nitrogen sold by them to others other than where such information is published to the general trade;

5. To exchange information as to production, sales, shipments, inventories, future imports of fertilizer nitrogen, or private figures as to importation or exportation of fertilizer nitrogen, other than where such information is published to the general trade.

Nothing contained in the numbered subparagraphs (1) to (5), inclusive, of this paragraph III shall be deemed to prohibit the operation of any existing or future sales agency otherwise lawful when the operations thereunder do not involve any arrangements, agreements, or understandings, between the agent and the principal concerning sales or other disposition by the agent of products or commodities belonging to the agent or anyone other than the principal, and provided further that such principal is not in the particular transaction acting as an agent for any other manufacturer of

fertilizer nitrogen, nor shall the numbered sub-paragraphs (1) to (5) prohibit the purchase or sale of fertilizer nitrogen, otherwise lawful, by defendant Imperial Chemical Industries (New York) Ltd., its successors, subsidiaries, officers or employees, from or to any producer or distributor of fertilizer nitrogen.

IV

The defendant, Imperial Chemical Industries (New York), Ltd., its successors, subsidiaries, officers, and employees, are hereby ordered to advise and inform and to give full information to the Attorney General of the United States or the Assistant Attorney General in charge of the Antitrust Division of the happening of any of the events and full data concerning any agreement, combination or cartel mentioned herein:

(1) If the said Imperial Chemical Industries (New York), Ltd., or any of its parents or subsidiaries should enter into any agreement, combination, or cartel with any one or more other producers or distributors of fertilizer nitrogen, the effect or operation of which would result in a violation of any of the provisions of Paragraph III hereof.

(2) If any agreement, combination, or cartel to which Imperial Chemical Industries (New York) Ltd., or any of its parents or subsidiaries and any one or more other producers or distributors of fertilizer nitrogen are parties, should become operative in such a way as to result in a violation of any of the provisions of Paragraph III hereof.

The failure of the Attorney General of the United States or the Assistant Attorney General in charge of the Antitrust Division to take any action following the receipt of any advice or information from Imperial Chemical Industries (New York) Ltd., pursuant to Paragraph IV shall not be construed as an approval of the matters and things so advised or informed, and shall not operate as a bar to any action or proceeding, civil or criminal, which may later be brought pursuant

A3

to any law of the United States based on the matters and things so advised and informed.

## V

For the purpose of securing compliance with this decree, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or an Assistant Attorney General and on reasonable notice to the defendant made to the principal office of the defendant, be permitted, subject to any legally recognized privilege (1) access, during the office hours of the defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of the defendant, relating to any matters contained in this decree (2) subject to the reasonable convenience of the defendant and without restraint or interference from them, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters, and (3) the defendant, on such request, shall submit such reports in respect of any such matters as may from time to time be reasonably necessary for the proper enforcement of this decree: *Provided, however*, That information obtained by the means permitted in this paragraph shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceedings for the purpose of securing compliance with this decree in which the United States is a party or as otherwise required by law.

## VI

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this decree to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this decree, for the modification or termination of any of the provisions thereof for the enforcement of compliance therewith and for the punishment of violations thereof.

## VII

Nothing in this decree shall be construed to restrict or prohibit in any way any action taken by any defendant, its successors, subsidiaries, officers, or employees in good faith and within the fair intendment of the letter of the Attorney General of the United States to the General Counsel of the Office of Production Management, dated April 29, 1941 (a copy of which is attached hereto as Exhibit "A"), or with any amendment or amplifications thereof by the Attorney General, or in accordance with any arrangement of similar character between the Attorney General and any National Defense Agency in effect at the time, provided such letter or arrangement has not at the time of such action been withdrawn or cancelled with respect thereto.

## VIII

This decree shall have no effect with respect to operations or activities outside the United States, its territories and the District of Columbia not violative of the Antitrust laws or to operations and activities within the United States, its territories and the District of Columbia relating exclusively to acts and operations outside the United States, its territories and the District of Columbia not violative of the Antitrust laws, or to operations and activities, wherever performed, authorized or permitted by the Act of Congress of April 10, 1918, commonly called the Webb-Pomerene Act, or by acts amendatory thereof.

Dated February 17, 1942.    Approved.

SIMON H. RIFKIND,
*United States District Judge.*

Judgment rendered, February 18, 1942.

GEORGE J. H. FOLLMER, *Clerk.*

A4

EXHIBIT "A"

APRIL 29, 1941

JOHN LORD O'BRIAN, ESQUIRE,

*General Counsel, Office of Production Management,*
*Washington, D. C.*

DEAR JOHN: The marshaling of the nation's industrial assets for a maximum productive effort in the national defense will doubtless require the allocation of orders, the curtailment of some kinds of production so as to increase production in defense fields, and the establishment of priorities and price ceilings. Furthermore, many of these steps must necessarily affect the production of goods used to satisfy our normal needs, as well as the production of materials and implements used directly in our defense effort.

Some of these acts if accomplished by private contract or arrangement within an industry and carried on for private advantage would probably constitute violations of the antitrust laws. On the other hand, it is obvious that in the present emergency acts performed by industry under the direction of public authority, and designed to promote public interest and not to achieve private ends, do not constitute violations of the antitrust laws. In these circumstances, the Department of Justice recognizes that business interests which are asked to comply with public plans for increasing production and preventing inflation are entitled to the cooperation of agencies of the Government in eliminating any uncertainties which may exist as to the application of the antitrust laws to their activities.

Accordingly, this Department has formulated a policy which it proposes to follow in its relations with the Office of Production Management and the Office of Price Administration and Civilian Supply and with all industries or contractors acting in compliance with the orders or request of either of these organizations. The important points of this policy are:

Meetings of the industry with the Office of Production Management and the Office of Price Administration and Civilian Supply or their representatives are not illegal. In-

dustrial committees may be formed at the request of the Office of Production Management or the Office of Price Administration and Civilian Supply, to work with representatives of such offices on problems involving defense. There will be nothing unlawful in the industry cooperating in the selection of its representatives or in selecting members for committees, or in the activities of such committees provided they are kept within the scope of this letter.

Questions as to whether there is need for such a committee, and if so, how it shall be chosen, and by whom constituted, shall be the sole responsibility of the Office of Production Management or the Office of Price Administration and Civilian Supply. This Department will not participate in these decisions beyond the suggestion now made that any such committee should be generally representative of the entire industry and satisfactory to the Office of Production Management or the Office of Price Administration and Civilian Supply.

Each industry committee shall confine itself to collecting and analyzing information and making recommendations to the Office of Production Management or the Office of Price Administration and Civilian Supply, and shall not undertake to determine policies for the industry, nor shall it attempt to compel or to coerce any one to comply with any request or order made by a public authority.

All requests for action on the part of any unit of an industry shall be made to such unit by the Office of Production Management or the Office of Price Administration and Civilian Supply and not by the industry committee. That is to say, the function of determining what steps should be taken in the public interest should in each case be exercised by the public authority which may seek the individual or collective advice of the industry. But the determination shall not be made by the industry itself or by its representatives.

Requests for action within a given field, such as the field of allocation of orders, shall be made only after the general character of the action has been cleared with the Department of Justice. If the general plan is approved, thereafter each request for specific action in carrying out such plan shall be

A5

made in writing and shall be approved by the Office of the General Counsel of the Office of Production Management or the office of the General Counsel of the Office of Price Administration and Civilian Supply, but need not be submitted to the Department of Justice. In the case of any change in the personnel of such offices or if serious practical difficulties arise, this latter arrangement may be revoked upon notice from me.

Acts done in compliance with the specific requests made by the Office of Production Management or the Office of Price Administration and Civilian Supply and approved by their General Counsel in accordance with the procedure described in this letter will not be viewed by the Department of Justice as constituting a violation of the antitrust laws and no prosecutions will be instituted for acts performed in good faith and within the fair intendment of instructions given by the Office of Production Management or the Office of Price Administration and Civilian Supply pursuant to this procedure.

In the case of all plans or procedure, however, the Department reserves complete freedom to institute civil actions to enjoin the continuing of acts or practices found not to be in the public interest and persisted in after notice to desist.

With kind personal regards,

Sincerely,

(S)   ROBERT H. JACKSON,

*Attorney General.*

A6

**EXHIBIT B**

**ORDERS FROM CASES TERMINATING
LEGACY ANTITRUST FINAL JUDGMENTS**

UNITED STATES v.
PARAMOUNT PICTURES, INC., *et. al*

19 Misc. 544 (AT)
2020 WL 453609 (S.D.N.Y. Aug. 7, 2020)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _8/7/2020_____ |

UNITED STATES OF AMERICA,

           Plaintiff,

    -against-

PARAMOUNT PICTURES, INC.,

           Defendant.

UNITED STATES OF AMERICA,

           Plaintiff,

    -against-

LOEW'S INCORPORATED, ET AL.,

           Defendants.

19 Misc. 544 (AT)

**ORDER**

ANALISA TORRES, District Judge:

This antitrust action concerns consent decrees known as the *Paramount* Decrees (the

"Decrees"), which ended the motion picture horizontal distributor cartel of the 1930s and 40s

and have regulated aspects of the movie industry for the last seventy years.[1] The Antitrust

Division of the United States Department of Justice moves to terminate the Decrees effective

immediately, except for a two-year sunset period on the Decrees' provisions banning block

booking and circuit dealing. *See* Gov't Mot. at 2, ECF No. 1; Gov't Mem. at 2, ECF No. 2.

*Amici curiae,* the Independent Cinema Alliance ("ICA") and the National Association of Theatre

---

[1] *See United States v. Paramount Pictures, Inc.*, Equity No. 87-273, 1948-49 Trade Cas. (CCH) ¶ 62,377 (S.D.N.Y. Mar. 3, 1949) (Paramount Pictures, Inc.); 1950-51 Trade Cas. (CCH) ¶ 62,861 (S.D.N.Y. June 7, 1951) (Twentieth Century Fox Film Corp.); 1950-51 Trade Cas. (CCH) ¶ 62,573 (S.D.N.Y. Feb. 8, 1950) (Columbia Pictures Corp., Universal Corp., and United Artists Corp.); 1950-51 Trade Cas. (CCH) ¶ 62,765 (S.D.N.Y. Jan. 4, 1951) (Warner Brothers Pictures, Inc.); and 1952-53 Trade Cas. (CCH) ¶ 67,228 (S.D.N.Y. Feb. 7, 1952) (Loew's Inc.); *see also* ECF No. 2-1 for copies of these Final Consent Judgments.

Owners ("NATO") oppose the motion.  *See* ICA Opp., ECF No. 41; NATO Opp., ECF No. 45.

For the reasons stated below, the Government's motion is GRANTED.

## BACKGROUND

In 1938, the Department of Justice brought an antitrust action against eight companies—Paramount Pictures, Inc. ("Paramount"), Twentieth Century Fox Film Corp. ("Fox"), Warner Brothers Pictures, Inc. ("Warner"), Loew's Incorporated ("Loew's"), Radio-Keith-Orpheum ("RKO"), Universal Corp. ("Universal"), Columbia Pictures Corp. ("Columbia), and United Artists Corp. ("United Artists") (collectively, "Defendants")—that, at the time, dominated the production and distribution of motion pictures in the United States.  *See United States v. Paramount Pictures*, 334 U.S. 131, 140 (1948); *see also United States v. Loew's Inc.*, 783 F. Supp. 211, 212 (S.D.N.Y. 1992).  The companies fell into two groups:  (1) those that produced, distributed, and exhibited movies and (2) those that produced or distributed films, but did not exhibit them.  *See Paramount*, 334 U.S. at 140; *see also* Gov't Mem. at 6–7.

Five of the Defendants, Paramount, Loew's, Warner, RKO, and Fox (collectively, the "Major Defendants") owned large movie theater circuits, including over seventy percent of the best and largest "first-run" theaters in the ninety-two largest cities in the United States.  *Paramount*, 334 U.S. at 167.  This market structure eventually led to cooperation and collusion, wherein Defendants established a cartel for the purposes of (1) limiting the first run of their pictures, as much as possible, to the theaters that the Major Defendants owned and controlled; and (2) closing off first-run theaters to their competitors, independent motion picture distributors.  *Id.* at 154–55.  In other words, Defendants created an intricate system of sequential and non-overlapping theatrical "runs" for their films.  Gov't Mem. at 8–9.  Pursuant to that scheme, Defendants classified all movie theaters into specific "run" categories.  *Id.*; *see also Paramount*,

334 U.S. at 144 n.6  The first run was exclusively reserved what were then called first-run theaters.  Gov't Mem. at 8–9.  This was the highest priced and most profitable "run" because most moviegoers saw movies within a few weeks of release.  *Id.*  Defendants agreed to designate almost all of the theaters that Major Defendants owned and controlled as first-run.  *Id.* at 9.  After the first run ended, Defendants distributed their movies to discount-priced theaters in the second-run market, and after the second run, to a more-discounted third, fourth, or later theatrical run.  *Id.*  Defendants agreed to relegate most independent theaters to the later and less profitable runs.  *Id.*

At trial, the district court found that Defendants had (1) monopoly power in the distribution market for first-run motion pictures; and (2) engaged in a conspiracy to fix licensing practices, including admission prices, run categories, and "clearances" for substantially all theaters located in the United States.  *Paramount*, 334 U.S. at 170–71; *United States v. Paramount Pictures*, 85 F. Supp. 881, 884, 896 (S.D.N.Y. 1949) ("[W]e have found that a conspiracy has been maintained through price fixing, runs and clearances, induced by vertical integration," and that "this conspiracy resulted in the exercise of monopoly power"); *see also Loew's Inc.*, 783 F. Supp. at 212 ("The proof at trial established that the five [Major Defendants] had, *inter alia*, engaged in a 'horizontal' conspiracy to monopolize the exhibition business by foreclosing independent exhibitors from access to first-run films, and the [other Defendants] acquiesced in that scheme.").

The Supreme Court affirmed the district court's finding that Defendants were liable under the Sherman Act, and remanded the matter to the district court to fashion relief that would "uproot all parts of [the] illegal scheme—the valid as well as the invalid—in order to rid the

trade or commerce of all taint of the conspiracy" and undo "what the conspiracy achieved." *Paramount*, 334 U.S. at 148, 171; *see id.* at 141–61.

On remand, the United States and each Defendant entered into separate decrees, now known as the *Paramount* Decrees, to remedy the competitive harms. The Decrees required the Major Defendants to sell their theaters to new independent companies. *See* Gov't Mem. at 11. For the Major Defendants, the Decrees applied equally to the distribution companies and the new companies set up to own and operate each of their movie theater circuits. *Id.* The Warner, Fox, and Loew's decrees also prohibited their distribution companies from acquiring any theaters unless the district court found that such acquisitions would not unreasonably restrain competition. *Id.* Because they were entered earlier, the RKO and Paramount decrees did not contain that restriction. *Id.* RKO and Paramount, like Universal, Columbia, and United Artists, have always been free to acquire theaters without court approval. *Id.* at 11–12.

In addition to the theater divestiture requirements, the Decrees restricted the ways in which all Defendants could license and distribute movies to theaters. Specifically, the Decrees barred each Defendant from engaging in the following practices:

- Resale price maintenance – setting minimum movie ticket prices (section II, paragraph 1 and section III, paragraph 1 of the Warner decree);
- Unreasonable clearances – granting exclusive film licenses for overly broad geographic areas (section II, paragraphs 2, 3, and 4 and section III, paragraphs 2, 3, and 4 of the Warner decree);
- Block booking – bundling multiple films in one theatrical license (section II, paragraph 7 and section III, paragraph 7 of the Warner decree); and
- Circuit dealing – licensing a film to all theaters under common ownership or control instead of theater by theater (section II, paragraphs 6 and 8 and section III, paragraphs 6 and 8 of the Warner decree).

*Id.* at 12.

In 2018, the Antitrust Division announced an initiative to review, and where appropriate, terminate or modify "legacy antitrust judgments that no longer protect competition" because of

"changes in industry conditions, changes in economics, changes in law, or for other reasons." *See* U.S. Department of Justice Press Release, *Department of Justice Announces Initiative to Terminate "Legacy" Antitrust Judgments* (Apr. 25, 2018), https://www.justice.gov/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments.

The Government's review of the Decrees included a 60-day notice and public comment period. Gov't Mem. at 4–5. It received over eighty comments, many of which oppose termination of the Decrees. *Id.* at 5. The Government now moves to terminate the Decrees, effective immediately, and, in response to the comments received, proposes to add a two-year sunset period to the Decrees' block booking and circuit dealing provisions to provide a transition period to minimize market disruption. *Id.* at 5–6.

## DISCUSSION

I.    <u>Standard of Review</u>

Under Rules 60(b)(5) and 60(b)(6) of the Federal Rules of Civil Procedure, on "motion and just terms, the court may relieve a party . . . from a final judgment [when] . . . applying it prospectively is no longer equitable; or any other reason that justifies relief." Fed. R. Civ. P. 60(b). Each of the Decrees provides that this Court retains jurisdiction to enable "any of the parties . . . and no others, to apply to the Court at any time for any such further order . . . as may be necessary or appropriate for the construction, modification, or carrying out of the same, . . . or for other or further relief." *See, e.g.*, Loew's Inc. Decree 1952-53 Trade Cas. (CCH) ¶ 67,228 (S.D.N.Y. Feb. 7, 1952) at Section X, ECF No. 2-1 at 74.

"Where, as here, the United States consents to the proposed termination of the judgment in a Government antitrust case, the issue before the Court is whether termination of the judgment

is 'in the public interest.'" *Loew's Inc.*, 783 F. Supp. at 213 (internal quotation marks and citations omitted) (terminating Decree in 1992 as to Loew's, on Government consent); *see also United States v. Int'l Bus. Machines Corp.*, 163 F.3d 737, 740 (2d Cir. 1998) ("By statute . . . the court may approve an antitrust consent decree only upon finding that it is 'in the public interest[.]'. Although the Tunney Act, by its terms, applies only to the approval of consent decrees, we have held that termination also requires judicial supervision—and 'consider[ation of] the public interest'—as a corollary to the Tunney Act." (quoting *United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983))).

The district court's "'public interest' determination must be based on the same analysis that it would use to evaluate the underlying violation." *United States v. Int'l Bus. Machines Corp.*, 163 F.3d 737, 740 (2d Cir. 1998). That evaluation "is necessarily forward-looking and probabilistic . . . focused on the likelihood of a potential future violation, rather than the mere possibility of a violation." *Id.* at 741–42.

"The Supreme Court has held that where the words 'public interest' appear in federal statutes designed to regulate public sector behavior, they 'take meaning from the purposes of the regulatory legislation.'" *Loew's Inc.*, 783 F. Supp. at 213 (quoting *NAACP v. FPC*, 425 U.S. 662, 669 (1976)). The antitrust laws, the "regulatory legislation" involved here, "were enacted for the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (internal quotation marks and citation omitted); *see also United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 170 (1964).

"[T]he Department of Justice has broad discretion in controlling government antitrust litigation." *Loew's Inc.*, 783 F. Supp. at 214 (citing *Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 689 (1961)). "[T]he Court, in making its public interest finding,

should . . . carefully consider the explanations of the government . . . and its responses to comments in order to determine whether those explanations are reasonable under the circumstances." *Id.* (citation omitted).

II.   Analysis

A.   Whether Termination is in the Public Interest

The Government has concluded that terminating the Decrees would be in the public interest for four reasons.  First, the Decrees achieved the Supreme Court's remedial mandate to this Court:  they "uproot[ed]" and ended Defendants' illegal conspiracy and, along with the passage of time, "rid" the industry of "all taint of the conspiracy," "undoing what the conspiracy achieved."  *Paramount*, 334 U.S. at 148, 171; *see* Gov't Mem. at 16.  Second, changes in the motion picture industry over the last seventy years have made it unlikely that the remaining Defendants could or would reinstate their cartel to monopolize the motion picture distribution and theater markets.  *Id.*  Third, antitrust case law has evolved to undermine the Decrees' ongoing regulatory provisions.  *Id.*  Although the Decrees bar vertical licensing practices as *per se* illegal, under current Supreme Court precedent, courts judge such conduct under the fact-specific "rule of reason" standard.  *Id.*  Finally, Defendants remain subject to liability under the antitrust laws.  Absent the Decrees, the Sherman Act would continue to provide effective deterrence against any industry-wide attempts to re-establish a cartel to monopolize the film distribution and exhibition markets.  *Id.*

The Court now assesses whether the Government "has offered a reasonable and persuasive explanation of why the termination of the [Decrees] . . . would serve the public interest in free and unfettered competition."  *Loew's*, 783 F. Supp. at 214; *see also N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958) ("The Sherman Act was designed to be a

comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.").[2]

### 1. Necessity of the Decrees

The Government argues that, after seventy years, the Decrees are no longer necessary. The gravamen of the *Paramount* case was a long-standing horizontal conspiracy among Defendants to monopolize the first-run motion picture theater market. Critical to this illegal cartel was that (1) Defendants collectively had monopoly power in the distribution market for first-run films; and (2) the Major Defendants also owned the best "first-run" theaters in the most important geographic locations. This market structure led to collusion that foreclosed independent distributors from sufficient access to the first-run theater market.

The Decrees put an end to Defendants' collusion and cartel and, in their absence, the market long-ago reset to competitive conditions. Both the market structure and distribution system that facilitated that collusion are no longer the same. As the Court explains below, seventy years of technological innovation, new competitors and business models, and shifting consumer demand have fundamentally changed the industry. As another court in this district previously stated in granting a motion to terminate an antitrust judgment: "In view of the changed environment in which the [f]inal [j]udgment now operates, there is no persuasive reason for maintaining it and imposing upon the defendants a decree which no longer comports with the current state of the market." *United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 870 (S.D.N.Y. 1987).

### 2. Changes to the Motion Picture Industry

In the seventy years since the Decrees were entered, the motion picture industry has seen significant changes. First, the Decrees forced the Major Defendants to separate their distribution

---

[2] The Tunney Act does not require a court to conduct an evidentiary hearing. 15 U.S.C. § 16(e)(2).

and theater operations; today, none of them own an appreciable percentage of the nation's movie theaters. Gov't Mem. at 18. In fact, no movie distributor owns a major theater. *Id.* Second, although the Decrees concerned first-run motion picture theater markets, films today are broadly released in single theatrical runs. *Id.* In the 1930s and 40s, the only way that the public could view a motion picture was in a single-screen movie theater. Multiplexes, broadcast and cable television, DVDs, and the internet did not exist. The singles-creen, theater-only distribution market provided Defendants with the incentive and ability to limit the first-run distribution of their films to a select group of owned or controlled theaters in order to maximize their profits, and to relegate independent theaters to subsequent less profitable runs. *Id.* at 18–19.

Today, subsequent theatrical runs, as well as subsequent-run theaters, no longer exist in any meaningful way. *Id.* at 19. Rather, major films are released broadly to thousands of multi-screen theaters at the same time in a single theatrical run. This material change in motion picture distribution was apparent in 1989, when the Second Circuit noted that, among other changes to this industry,

> the development of national television advertising . . . changed the business realities of the industry so that movie producers and distributors have every incentive to disseminate their products as quickly, and as widely, as possible. Many more exhibitors exhibit on many more screens than was the case when the consent judgments were entered into.

*United States v. Loew's Inc.*, 882 F.2d 29, 33 (2d Cir. 1989).

Moreover, as internet movie streaming services proliferate, film distributors have become less reliant on theatrical distribution. *See* Brooks Barnes, *The Streaming Era Has Finally Arrived. Everything Is About to Change*, New York Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/business/media/streaming-hollywood-revolution.html (discussing the advent and rise of internet movie streaming services). For example, some

independent distributors, relying on subscription, instead of box office revenues, currently release movies to theaters with either limited theatrical runs or on the same day as internet movie streaming services.  Netflix, which plans to release over fifty movies this year, "mostly bypasses theaters."  Brooks Barnes, *Netflix's Movie Blitz Takes Aim at Hollywood's Heart*, New York Times (Dec. 16, 2018), https://www.nytimes.com/2018/12/16/business/media/netflix-movies-hollywood.html; *see* Gov't Mem. at 20.

The competitors have also changed since the advent of the Decrees.  *Id.* at 20–21.  Many of the original defendants are no longer in business, including the RKO film distribution company, and all of the Loew's, Paramount, RKO, Warner, and Fox theater companies that were created as a result of the Decrees' divestiture provisions.  *Id.*  Others distribute far fewer films.  For example, MGM, one of the largest motion picture studios in the 1930s and 40s, distributed 52 movies in 1939, including *Gone with the Wind*, *The Wizard of Oz*, and *It's a Wonderful Life*, but only three films in 2018.  *Id.*

Motion picture distributors that are not subject to the Decrees have entered the market since the 1940s—most significantly, The Walt Disney Company, the leading movie distributor in 2018 with about $3 billion in domestic box office revenues.  *See id.* at 21.  Other motion picture distributors not subject to the Decrees include Lionsgate (20 films released in 2018), Focus Features (13 films), Roadside Attractions (12 films), and STX Entertainment (10 films).  *See id.*  None of the internet streaming companies—Netflix, Amazon, Apple and others—that produce and distribute movies are subject to the Decrees.  Thus, the remaining Defendants are subject to legal constraints that do not apply to their competitors.

*Amici* argue that although the Decrees apply only to Defendants, "the stakes of this deregulatory effort extend" beyond the specific Defendants in this case.  NATO Reply at 14,

ECF No. 51; *see also* ICA Opp. at 12–13. They contend that the "[c]onsent decrees serve as a yardstick of acceptable behavior, exerting a normative effect on industry actors who are not parties to them." NATO Reply at 14. But termination of the Decrees does not give Defendants, or other market participants, free rein to implement the same anti-competitive practices that the Decrees remedied. Termination simply implies that this Court, in performing a "necessarily forward-looking and probabilistic" evaluation, determined that termination would be in the public interest because there is a low "likelihood of a potential future violation," *IBM*, 163 F.3d at 741–42, given the changes in the market and the fact that motion picture distributors not subject to the Decrees have shown no propensity to acquire major movie theater circuits or engage in the type of collusive practices the Decrees targeted, Gov't Mem. at 21. If there is a future violation, however, that party would be subject to the liability under the full extent of federal and state antitrust laws, as they are today.

Given this changing marketplace, the Court finds that it is unlikely that the remaining Defendants would collude to once again limit their film distribution to a select group of theaters in the absence of the Decrees and, finds, therefore, that termination is in the public interest.

### 3. Changes in Antitrust Law

Changes in antitrust law also suggest that the potential for future violation is low. The Decrees' treatment of certain conduct as *per se* illegal and subject to criminal penalties—no matter what the factual circumstances—prohibits conduct that today may be deemed legal and beneficial to competition and consumers. For example, the Decrees outlawed vertical integration in order to end Defendants' horizontal conspiracy. *Paramount*, 334 U.S. at 174; *Paramount*, 85 F. Supp. at 893. Today, vertical integration would be reviewed under a different standard. The Supreme Court has recognized that vertical integration can create efficiencies that lower costs

and encourage innovation that often results in better products and lower prices for consumers.

*See, e.g.*, *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007). Under a fact-based "rule of reason" analysis, a court must weigh the competitive harm of foreclosing competitors—either motion picture distributors from theaters, or movie theaters from a movie distributor's films—against any procompetitive efficiencies to determine whether a transaction violates the antitrust laws. *See, e.g.*, *Loew's Inc.*, 882 F.2d at 33.

Statutory merger law also has changed significantly. At the time the Decrees were entered, companies could merge without any notification to the antitrust authorities. Today, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), 15 U.S.C. § 18a, requires parties who engage in a significant merger transaction (*e.g.*, where the merger involves an acquisition of securities or assets valued over $90 million) to notify the federal antitrust agencies and permit them to investigate before their transaction can close. In the absence of the Decrees, there would still exist industry oversight because a merger between any major movie distributor and one of the large national theater circuits would very likely require HSR filings, thereby providing the antitrust agencies with notice and opportunity to evaluate the competitive effects of the transaction.

The legal framework used to evaluate the Decrees' film licensing practices—including block booking, circuit dealing, and resale price maintenance—has also changed. Although *per se* illegal seventy years ago, today, courts would analyze such restraints under the rule of reason—evaluating the specific market facts to determine whether a practice's anticompetitive harm outweighs its procompetitive benefits. *See, e.g.*, *Leegin*, 551 U.S. at 907 (extending rule of reason analysis to minimum resale price maintenance claims); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26–29 (1984) (holding that tying arrangements [like block booking] are

presumed to be *per se* illegal only in certain factual circumstances, including where the defendant had market power and where the tie foreclosed competitors from the tied market); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1977) (holding that non-price vertical restraints are judged under rule of reason), *abrogated by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Lastly, maintaining the Decrees in perpetuity "would not be consistent with the current Department of Justice Antitrust Division policy of limiting consent judgments to a period of ten years." *Columbia Artists Mgmt., Inc.*, 662 F. Supp. at 866–67. Given the increased penalties that Congress has mandated for *per se* violations of the antitrust laws, the Antitrust Division concluded that a successful criminal prosecution under the Sherman Act would more effectively deter antitrust recidivists than a criminal contempt proceeding under provisions of a longstanding consent decree. *See id.*; *see also* Gov't Mem. at 4 n.6.

Because changes in antitrust law and administration have diminished the importance of the Decrees' restrictions, while still providing protections that will keep the probability of future violations low, the Court finds that termination of the Decrees is in the public interest.

4. Antitrust Laws as an Effective Deterrence

Finally, the Government argues that although terminating the Decrees would release Defendants from the Decrees' restrictions, they would still be subject to liability under federal and state antitrust law. Gov't Mem. at 26–28. Absent the Decrees, any plaintiff, whether the United States or a private plaintiff, would still have the advantage of the Supreme Court's and this Court's rulings in the *Paramount* litigation that resulted in the Decrees. Antitrust laws, and their faithful enforcement, weigh in favor of the Court's finding that there is a low likelihood of a potential future violation absent the Decrees. *IBM*, 163 F.3d at 740.

B.  Public Comments

Having concluded that the Government has "offered a reasonable and persuasive explanation" for why termination of the Decrees would "serve the public interest in free and unfettered competition," *Loew's Inc.*, 783 F. Supp. at 214, the Court turns to whether the comments received by the Government and the Court provide sufficient basis for denying the Government's motion, *see id.*  The Court concludes that they do not.

The Government solicited public comments with regard to whether the Decrees should be terminated or modified.  The comments focused on vertical integration in the motion picture industry and movie distribution and licensing practices.  *See* Gov't Mem. at 29–38.  The Government argues that the comments fail to establish that (1) there is a likelihood that the remaining *Paramount* Defendants would again collude to impose an anticompetitive distribution system or anticompetitive terms in their theatrical film licensing agreements, and (2) that current antitrust laws are inadequate to police any such collusion.  *Id.* at 30.

With respect to vertical integration, commenters argued that terminating the ban on vertical integration would allow major movie studios to merge with one of the large national theater circuits—AMC, Cinemark, or Regal.  *Id.*  The Government notes, however, that the Decrees do not prohibit the vertical integration commenters warn about because vertical restrictions apply only to a subset of movie distributors; the Decrees do not apply to every distributor in the market and do not even apply to every Defendant.  *See id.* at 31.  Moreover, the Court finds that changes to antitrust administration, in particular, the HSR Act, provide federal antitrust agencies with notice and the opportunity to evaluate the competitive significance of any major transaction between a movie distributor and a theater circuit, which suggests a low likelihood of potential future violation.  *IBM*, 163 F.3d at 741–42.

With respect to distribution and licensing practices, commentators, including *amici* ICA and NATO, argue that the restrictions on block booking and circuit dealing should be preserved. *See* Gov't Mem. at 32–36; NATO Opp. at 10–20.  Block booking is the "the practice of licensing . . . one feature or a group of features on condition that the exhibitor will also license another feature or group of features," *Paramount*, 334 U.S. at 156, "tying" multiple films together in one theatrical license, instead of licensing films on a film-by-film basis, *see id.* at 158.  Circuit dealing is the practice of licensing films to all movie theaters under common ownership, as opposed to licensing each film on a theater-by-theater basis.  *Id.* at 153–57.

In the 1930s and 40s, Defendants required block booking provisions in many of their theatrical licenses and they often required first-run theaters to license their entire season's output of films.  *United States v. Paramount Pictures*, 66 F. Supp. 323, 347 (S.D.N.Y. 1946), *aff'd in part, rev'd in part*, 334 U.S. 131(1948); *United States v. Paramount Pictures*, 70 F. Supp. 53, 63 (S.D.N.Y. 1946).  Requiring a key group of marquee theaters to show all of Defendants' films— one after the other—tied them up for weeks or months, thus foreclosing independent distributors from the first-run theaters they needed to successfully launch and distribute their films.  In today's landscape, although there may be some geographic areas with only a single one-screen theater, most markets have multiple movie theaters with multiple screens simultaneously showing multiple movies from multiple distributors.  There also are many other movie distribution platforms, like television, the internet and DVDs, that did not exist in the 1930s and 40s.  Given these significant changes in the market, there is less danger that a block booking licensing agreement would create a barrier to entry that would foreclose independent movie distributors from sufficient access to the market.

Market changes have also limited any dangers posed by the practice of circuit dealing.  In

the 1930s and 40s, Defendants illegally agreed among themselves to use circuit deals to ensure that the first run of their films played in the theaters that the Major Defendants owned and controlled, thus foreclosing independent theaters from those films' first runs. *Paramount*, 70 F. Supp. at 63. By doing so, Defendants used their collective market power in film distribution to gain a monopoly in the first-run theater market. Because the Decrees ended the collusion and required the Major Defendants to separate their film distribution and theater operations, and the industry no longer uses sequential theatrical runs, it is unlikely that any collective attempt by Defendants to once again monopolize the theater market would or could reoccur.

The Government moves to terminate the Decrees immediately, but with a two-year sunset period for the Decrees' block booking and circuit dealing provisions which would provide movie theaters a transitional time period to adjust their business models and strategies to any proposals to change the film-by-film, theater-by-theater licensing regime.[3] This sunset period responds to the concerns that the movie theaters raise in their public comments.

The Court concludes, therefore, that the Government has "offered a reasonable and persuasive explanation" for why the termination of the Decrees would "serve the public interest in free and unfettered competition." *Loew's Inc.*, 783 F. Supp. at 214. The Government has addressed the public comments received by the Department of Justice, and the objections set forth in the *amicus briefs*, by including a two-year sunset period for the Decrees' block booking and circuit-dealing provisions. Moreover, the Court concludes that these objections do not provide sufficient basis for denying the Government's motion. *See id.* at 214. That is not to say that any given merger between distributors and theaters, or any particular set of film licensing practices, would necessarily be lawful—only that the Government and courts have the tools to

---

[3] The Decrees' provisions relating to block booking and circuit dealing are set forth in each Decree in section II, paragraphs 6, 7, and 8, except for the Warner decree; and section III, paragraphs 6, 7, and 8 of the Warner decree. *See* Gov't Mem. at 2 n.2.

carefully assess potential threats to competition in the movie industry as they arise without the need to rely on these outdated court orders.

## CONCLUSION

For the reasons stated above, the Government's motion is GRANTED. The Decrees are terminated, effective immediately, except for a two-year sunset period on the Decrees' provisions banning block booking and circuit dealing.

The Clerk of Court is directed to terminate the motions at ECF Nos. 1 and 2 and close this case.

SO ORDERED.

Dated: August 7, 2020
     New York, New York

_____
ANALISA TORRES
United States District Judge

IN RE: TERMINATION OF LEGACY
ANTITRUST JUDGMENTS IN THE
NORTHERN DISTRICT OFCALIFORNIA

Civil Action No.: 19-mc-80147-TSH

Date Order Entered: July 3, 2019

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  TERMINATION OF LEGACY ANTITRUST JUDGMENTS IN THE NORTHERN DISTRICT OF CALIFORNIA | Case No.  19-mc-80147-TSH<br><br>**REPORT AND RECOMMENDATION TO TERMINATE LEGACY ANTITRUST JUDGMENTS**<br><br>Re: Dkt. No. 1 |

## I.    INTRODUCTION

On April 25, 2018, the Antitrust Division of the United States Department of Justice (the "Antitrust Division") announced an initiative to terminate legacy antitrust judgments that no longer protect competition.  The government now brings the present motion seeking to terminate judgments in 37 cases pursuant to Federal Rule of Civil Procedure 60(b).  ECF No. 1. The government argues that the age of the judgments and changed circumstances since their entry justify terminating them.  Because not all parties have consented to Magistrate Judge jurisdiction, the Clerk of Court shall **REASSIGN** this case to a District Judge for disposition. After carefully reviewing the motion and controlling authorities, the undersigned **RECOMMENDS** the District Judge **GRANT** the motion to terminate the legacy antitrust judgments.

## II.    BACKGROUND

From 1890, when the antitrust laws were first enacted, until the late 1970s, the United States frequently sought entry of antitrust judgments whose terms never expired.  Starting in 1979, the Antitrust Division adopted the practice of including a term limit of ten years in nearly all of its antitrust judgments.  Perpetual judgments entered before the policy change, however, remain in

effect indefinitely unless a court terminates them.  On April 25, 2018, the Antitrust Division announced that it would review 1,300 legacy judgments to identify those that no longer serve to protect competition and seek to terminate them.  Department of Justice Announces Initiative to Terminate "Legacy" Antitrust Judgments, *The United States Department of Justice* (2018), https://www.justice.gov/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments (last visited July 3, 2019).  The process it follows includes: (1) reviewing outstanding judgments to identify those that no longer appear to protect competition such that termination would be appropriate, (2) posting the name of the case with a link to the relevant judgment on the public website if the Antitrust Division believes it is a candidate for termination, (3) allotting the public 30 days to provide comments regarding each proposed termination, and (4) filing a motion with the appropriate court seeking to terminate the judgment if the Antitrust Division still believes termination is appropriate following the comment period.  *Id.*

In the present case, the Antitrust Division has petitioned to terminate 37 judgments in cases brought under the Sherman Act, 15 U.S.C. §§ 1-7, and the Clayton Act, 15 U.S.C. §§ 12-27.  The judgments were entered by this Court between 120 and 32 years ago.  The government posted the 37 judgments for public comment on March 8, 2019.  Judgment Termination Initiative, *The United States Department of Justice* (2018), https://www.justice.gov/atr/JudgmentTermination (last visited July 3, 2019).  The notice identified the cases, linked to the judgments, and invited public comments.  *Id.*  No comments were received opposing termination.  Mot. at 1.

### III.   LEGAL STANDARD

"Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances[.]"  *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005).  Rule 60 provides that these limited set of circumstances include:

> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

A Rule 60(b)(5) motion may be granted "when the party seeking relief from an injunction

or consent decree can show 'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). Because Rule 60(b)(5) "encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances," *Frew v. Hawkins*, 540 U.S. 431, 441 (2004), the Court "should apply a 'flexible standard' to the modification of consent decrees when a significant change in facts or law warrants their amendment." *Id.* (citing *Rufo*, 502 U.S. at 393).

Rule 60(b)(6) is residual to the other grounds listed in Rule 60(b) and is reserved for "any other reason that justifies relief" and requires "extraordinary circumstances." *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.,* 791 F.2d 1334, 1338 (9th Cir. 1986).

## IV.   DISCUSSION

The Antitrust Division argues that the judgments presumptively should be terminated because of their age, because they are unnecessary, and because there has been no public opposition to termination. The Antitrust Division also argues that its experience enforcing antitrust laws has shown that markets evolve over time in ways that render long-lived judgments no longer protective of competition. Mot. at 4.

Here, the judgments the Antitrust Division seeks to terminate were issued between 120 and 32 years ago. For nine of the judgments, the Antitrust Division has determined that most of the defendants likely no longer exist. Mot. at 5. For 22 of the judgments, the Antitrust Division has determined that the prohibited acts largely just recite conduct already prohibited by the antitrust laws. *Id*. at 6. For eight of the judgments, the Antitrust Division has concluded that the issues which the cases addressed involve markets where conditions have changed such that the judgment no longer protects competition. Mot. at 6; *see, e.g., United States v. Cont'l Grain Co.,* No. 1:70-CV-6733, 2019 WL 2323875, at *2 (E.D. Tex. May 30, 2019) ("After the passage of nearly 50 years, the court is satisfied that the judgment in this case has exhausted its useful purpose and that the dangers it once addressed are no longer present."). For five of the judgments, the government asserts that the requirements of the judgments have been met, rendering them satisfied in full. Mot. at 7. Further, the Government received no opposition to the termination of any of these judgments during the public comment period. *See Cont'l Grain Co.*, 2019 WL 2323875, at *2

(considering lack of opposition as a relevant factor in decision to terminate judgments).  Given these circumstances, termination of the 37 judgments is appropriate.  *See, e.g., United States v. Eastman Kodak Co.,* 63 F.3d 95, 102 (2d Cir. 1995) (affirming a district court's exercise of equitable discretion to terminate antitrust decrees where (1) the primary purposes of the decrees— the elimination of monopoly and unduly restrictive practices—had been achieved and (2) termination of the decrees would benefit consumers).

Further, other district courts across the country have terminated judgments in similar circumstances.  *See United States v. Am. Amusement Ticket Mfrs. Ass'n*, No. 1:18-mc-00091 (D.D.C. Aug. 15, 2018) (terminating nineteen judgments); *In re: Termination of Legacy Antitrust Judgments*, No. 2:18-mc-00033 (E.D. Va. Nov. 21, 2018) (terminating five judgments); *United States v. The Wachovia Corp. and Am. Credit Corp.*, No. 3:75-cv-2656 FDW DSC (W.D.N.C. Dec. 17, 2018) (terminating one judgment); *United States v. Capital Glass & Trim Co.*, et al., No. 3679N (M.D. Ala. Jan. 2, 2019) (terminating one judgment); *United States v. Standard Sanitary Mfg. Co.*, et al., No. 19-mc-00069 RDB (D. Md. Feb. 7, 2019) (terminating nine judgments).

## V.    CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** the District Judge **GRANT** the government's motion to terminate the legacy antitrust judgments.  Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2), a party may serve and file any objections within 14 days after being served.

Dated: July 3, 2019

THOMAS S. HIXSON
United States Magistrate Judge

IN RE: TERMINATION OF LEGACY
ANTITRUST JUDGMENTS IN THE
NORTHERN DISTRICT OF CALIFORNIA

Civil Action No.: 19-mc-80147-TSH

Date Order Entered: July 19, 2019

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-mc-80147-JST |
| Plaintiff, | |
| v. | **ORDER ADOPTING MAGISTRATE'S REPORT AND RECOMMENDATION** |
| COAL DEALERS ASSOCIATION OF CALIFORNIA, et al., | Re: ECF No. 1, 3 |
| Defendants. | |

The Court has reviewed Magistrate Judge Thomas Hixson's report and recommendation to grant the United States' Rule 60(b) motion to terminate legacy antitrust judgments that no longer protect competition. ECF No. 3. The Court finds the report to be correct, well-reasoned, and thorough, and adopts it in every respect.

The Court further notes that Judge Hixson's report was not served on any party. Given that this motion seeks to terminate judgments entered between 120 and 32 years ago and that many of the affected entities no longer exist, the Court finds that the government's public comment initiative provided adequate notice under the circumstances. ECF No. 2 ¶¶ 5-7.

**IT IS SO ORDERED.**

Dated: July 19, 2019

_____
JON S. TIGAR
United States District Judge

UNITED STATES  v.
CONTINENTAL GRAIN COMPANY

Civil Action No.: 1:70-CV-6733

Date Order Filed:  May 30, 2019

2019 WL 2323875
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas.

UNITED STATES OF AMERICA, Plaintiff,
v.
CONTINENTAL GRAIN COMPANY, Defendant.

CIVIL ACTION NO. 1:70-CV-6733
|
Filed 05/30/2019

**MEMORANDUM AND ORDER**

MARCIA A. CRONE UNITED STATES DISTRICT
JUDGE

*1 Pending before the court is Plaintiff United
States of America's (the "Government") Motion
and Memorandum Regarding Termination of Legacy
Antitrust Judgment (#2), wherein it requests that the court
terminate a judgment it entered in 1970 that enjoined
Defendant Continental Grain Company ("Continental")
from conditioning the availability of its grain loading
services on an agreement to use particular stevedoring
services for grain handling. Having considered the motion
and the applicable law, the court is of the opinion that the
Government's motion should be GRANTED and that the
final judgment in this case should be TERMINATED.

I. Background

On July 21, 1970, Judge Joe J. Fisher entered a final
judgment in this case finding that the Government had
stated a claim upon which relief could be granted pursuant
to the Sherman Act and enjoining Continental from
conditioning the use of its grain loading services on
an agreement to use particular stevedoring services for
grain handling. The judgment did not indicate that this
prohibition would end at any particular point, and it has
been in effect indefinitely. On April 29, 2019, over 48 years
after the final judgment was entered, the Government
filed the present motion wherein it seeks to terminate
the injunction against Continental pursuant to Federal
Rules of Civil Procedure 60(b)(5) and 60(b)(6). The
Government argues the judgment should be terminated
because it is outdated, it does not conform with the
Government's present-day policy regarding the length of

antitrust judgments, and a request for public comment on
terminating the judgment went unanswered.

II. Analysis
Rule 60(b) of the Federal Rules of Civil Procedure
provides that a court may relieve a party or its legal
representative from a final judgment, order, or proceeding
for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable
diligence, could not have been discovered in time to
move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or
extrinsic), misrepresentation, or misconduct by an
opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or
discharged; it is based on an earlier judgment that has
been reversed or vacated; or applying it prospectively
is no longer equitable; or

(6) any other reason that justifies relief.

FED. R. CIV. P. 60(b).

The party seeking relief from a judgment, order, or
proceeding bears the burden of showing that Rule 60(b)
applies. *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015)
(citing *League of United Latin Am. Citizens, Dist. 19 v. City
of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011)); see *Lyles
v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305,
316 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1037 (2018);
*United States v. City of New Orleans*, 947 F. Supp. 2d
601, 615 (E.D. La.), *aff'd*, 731 F.3d 434 (5th Cir. 2013).
"[T]he decision to grant or deny relief under Rule 60(b) lies
within the sound discretion of the district court and will be
reversed only for abuse of that discretion." *Lyles*, 871 F.3d
at 315 (quoting *Hesling v. CSX Transp. Inc.*, 396 F.3d 632,
638 (5th Cir. 2005)); see *Buck v. Davis*, ___ U.S. ___, 137
S. Ct. 759, 777 (2017) ("Rule 60(b) vests wide discretion
in courts ...."). Rule 60(b) "is to be construed liberally to
do substantial justice ... [it] is broadly phrased and many
of the itemized grounds are overlapping, freeing Courts to
do justice in hard cases where the circumstances generally
measure up to one or more of the itemized grounds."

*Frew*, 780 F.3d at 327 (quoting *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 600 (5th Cir. 1980)).

**\*2** Under Rule 60(b)(6), a district court may relieve a party from an order or proceeding for any reason which justifies relief, other than those also enumerated in Rule 60(b). *Buck*, 137 S. Ct. at 777; *see Rocha v. Thaler*, 619 F.3d 387, 399-400 (5th Cir. 2010), *cert. denied*, 565 U.S. 941 (2011). "Rule 60(b)(6) is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses ...." *Balentine v. Thaler*, 626 F.3d 842, 846 (5th Cir. 2010), *cert. denied*, 564 U.S. 1006 (2011) (quoting *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995)); *see Guevara v. Davis*, 679 F. App'x 332, 334 (5th Cir.), *cert. denied*, 138 S. Ct. 554 (2017); *Boissier v. Katsur*, 676 F. App'x 260, 264 (5th Cir. 2017). The court is of the opinion that Rule 60(b)(5) warrants relief in this case; hence, reliance on Rule 60(b) (6) is not necessary.

Rule 60(b)(5) authorizes district courts to terminate final judgments with prospective effects when their enforcement is no longer equitable. *Pico v. Glob. Marine Drilling Co.*, 900 F.2d 846, 851 (5th Cir. 1990); *Bailey v. Ryan Stevedoring Co.*, 894 F.2d 157, 160 (5th Cir. 1990). "In reviewing a request for relief under Rule 60(b)(5), '[w]e are not framing a decree [...] [w]e are asking ourselves whether anything has happened that will justify us now in changing a decree.' " *W. Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 108 (5th Cir. 1994) (quoting *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932)). "The inquiry ... is whether the changes are so important that the dangers, once substantial, have become attenuated to a shadow." *Swift & Co.*, 286 U.S. at 119. There is no time limit on

when a Rule 60(b)(5) motion must be filed, other than that it should be brought "within a reasonable time." *Johnson Waste Materials*, 611 F.2d at 601.

Continuing injunctions, such as the one at issue here, "have the requisite prospective effect" required by Rule 60(b)(5). *Cook v. Birmingham News*, 618 F.2d 1149, 1152 (5th Cir. 1980). The Government contends that the judgment should be terminated because permanent antitrust injunctions typically fail to protect competition, as markets change over time due to competitive and technological advances. In fact, beginning in 1979, this prompted the Government to begin including term limits, typically no longer than 10 years, on the judgments they sought. After the passage of nearly 50 years, the court is satisfied that the judgment in this case has exhausted its useful purpose and that the dangers it once addressed are no longer present. Further, the Government received no opposition to the termination of this judgment during the public comment period. The Government has demonstrated that relief from this judgment is warranted under Rule 60(b)(5). Thus, the Government's motion is GRANTED.

III. Conclusion

Consistent with the foregoing analysis, it is ordered that the final judgment entered in this case is TERMINATED.

SIGNED at Beaumont, Texas, this 30th day of May, 2019.

**All Citations**

Slip Copy, 2019 WL 2323875

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES v.
KAHN'S BAKERY, INC., MEAD FOODS, INC.,
AND RAINBO BAKING CO. OF EL PASO

Civil Action No.: EP-75-CA-106

Date Order Entered: March 26, 2019



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS,
EL PASO DIVISION

2019 MAR 26  AM 9: 50

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>KAHN'S BAKERY, INC., MEAD FOODS, INC., and RAINBO BAKING CO. OF EL PASO,<br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§        EP-75-CA-106 |

## ORDER GRANTING MOTION TO TERMINATE LEGACY ANTITRUST JUDGMENT

On this day, the Court considered the Government's "Motion to Terminate Legacy Antitrust Judgment" [hereinafter "Motion"], filed on February 7, 2019, in the above-captioned cause. Therein, the Government moves to terminate the judgment in this antitrust case pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, having concluded that "because of its age and changed circumstances since its entry, the judgment—which was issued 41 years ago—no longer serves to protect competition." Mot. 1. After due consideration, the Court is of the opinion that the Motion should be granted for the reasons that follow.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 1975, the Government filed its Complaint against

Defendants Kahn's Bakery, Incorporated, Mead Foods, Incorporated, and

Rainbo Baking Company of El Paso [hereinafter "Defendants"], who were the

"principal processors and sellers of bread products in the El Paso area."

Compl. 3.  In its Complaint, the Government alleged that "[b]eginning at

least as early as 1954 . . . and continuing thereafter at least until January 1,

1974, the [D]efendants and co-conspirators have engaged in a combination

and conspiracy in unreasonable restraint of . . . interstate trade and

commerce." *Id.* at 4.  Specifically, the Government alleged that Defendants

and co-conspirators agreed "(a) to fix, raise, and maintain the prices of

bakery products sold by the [D]efendants as wholesale bakers to retail

outlets in the El Paso area; and (b) to submit collusive and rigged bids to

government agencies and other institutions requesting competitive bids for

the sale of bakery products." *Id.* at 5.  Accordingly, the Government brought

a claim pursuant to the Sherman Act in order to prevent and restrain

antitrust violations by Defendants. *Id.* at 1.  Additionally, the Government

brought claims pursuant to the Clayton Act and False Claims Act to recover

2

damages in connection with the Government's capacity as purchaser of bread products for use by Federal installations. *Id.*

On August 19, 1977, District Judge John H. Wood, Jr. entered a Final Judgment. The judgment perpetually enjoins Defendants from bid rigging and price fixing. Final J. 3. Furthermore, the Final Judgment enjoins each Defendant from communicating bread prices to any other Defendant for a period of ten years and, additionally, enjoins each Defendant from communicating future prices to any other Defendant. *Id.* Additionally, the Final Judgment requires Defendants to pay the Government the aggregate sum of $110,001, paid in installments for a period of six consecutive years. *Id.* at 7. Finally, the Final Judgment, contains terms to ensure compliance with the Final Judgment, including the requirement, for a period of five years, that each Defendant submit affidavits certifying that its bids and price lists are not the product of agreement with other bread sellers and the requirement that Defendants provide the Government access to relevant records upon written request by the Government. *Id.* at 5–6. Over forty-one years later, on February 7, 2019, the Government filed its Motion, requesting that the judgment be terminated.

3

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 60(b)(5) and (b)(6), "the court may relieve a party . . . from a final judgment. . . (5) [when] applying it prospectively is no longer equitable; or (6) [for] any other reason that justifies relief." The Fifth Circuit has recognized that "Rule 60(b) is to be construed liberally to do substantial justice." *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (quoting *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 600 (5th Cir. 1980)). Furthermore, "[t]he rule is broadly phrased and many of the itemized grounds are overlapping, freeing Courts to do justice in hard cases where the circumstances generally measure up to one or more of the itemized grounds." *Id.*

## III. DISCUSSION

The Government files its Motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and seeks to terminate the judgment in this case. In its Motion, the Government explains that, since 1979, the Antitrust Division has generally followed a policy of including in each judgment a term that automatically terminates the judgment after no more than ten years. Mot. 1. This policy is based on the Government's realization "that markets almost always evolve over time in response to competitive and technological

4

changes in ways that render long-lived judgments no longer protective of competition or even anticompetitive." *Id.* at 1–2. Because hundreds of judgments entered prior to the 1979 policy contained no termination clause and remain in force today, the Government has "implemented a program to review and, when appropriate, seek termination of these perpetual legacy judgments, including the judgment in this case." *Id.* at 2 (first citing Department of Justice's Initiative to Seek Termination of Legacy Antitrust Judgments, 83 Fed. Reg. 19,837 (May 4, 2018), https://www.gpo.gov/fdsys/granule/FR-2018-05-04/2018-09461); and then citing *Judgment Termination Initiative*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/atr/JudgmentTermination (last updated Feb. 1, 2019)). Courts in other districts have granted the Government's requests to terminate legacy antitrust judgments. *In re: Termination of Legacy Antitrust Judgments,* No. 2:18-mc-00033 (E.D. Va. Nov. 21, 2018) (terminating five legacy antitrust judgments); *United States v. Am. Amusement Ticket Mfrs. Ass'n*, Case 1:18-mc-00091 (D.D.C. Aug. 15, 2018) (terminating nineteen legacy antitrust judgments).

The Government provides several reasons for terminating the judgment in the instant case. First, the Government argues, because the

5

judgment is over forty-one years old, it "presumptively should be terminated because of its age." Mot. 3. Furthermore, "many of the judgment's requirements have elapsed or been satisfied," including the ten-year prohibition against communicating prices and the order to pay damages. *Id.* Additionally, the perpetual terms prohibiting Defendants from bid rigging and price fixing "target that which the antitrust laws already prohibits." *Id.* Based on the Government's assessment that the judgment should be terminated, the Government "gave the public notice of—and the opportunity to comment on—its intention to seek termination of the judgment." *Id.* at 4; *Legacy Antitrust Judgment: U.S. v. Kahn's Bakery, Inc., et al.*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/atr/legacy-antitrust-judgment-kahns-bakery-inc-et-al (last updated Sept. 17, 2018). The Government received no comments. *Id.*

After due consideration, the Court concludes that the Government has demonstrated that the Final Judgment no longer serves to protect competition. In light of the rationale for the Government's Judgment Termination Initiative and the reasons offered by the Government for terminating the Final Judgment in this case, including the age of the Final Judgment, the lapse and satisfaction of its key terms, and the absence of any

6

opposition to the Government's position, the Court is of the opinion that it is appropriate to terminate the Final Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

## IV.   CONCLUSION

Accordingly, **IT IS ORDERED** that the Government's "Motion to Terminate Legacy Antitrust Judgment" is **GRANTED**.

**IT IS FURTHER ORDERED** that the **FINAL JUDGMENT** entered in this case is **TERMINATED**.

SIGNED this _26_ day of **March, 2019**.

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE

7

UNITED STATES v.
VIRGIN ISLANDS GIFT AND FASHION
SHOP ASSOCIATION, INC., *et al.*

Civil Action No.: 1969-295

Date Order Entered: June 11, 2019

DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VIRGIN ISLANDS GIFT AND FASHION )<br>SHOP ASSOCIATION, INC.; C. & M. )<br>CARON, INC.; A.H. RIISE GIFT SHOP, )<br>INC.; CAVANAGH'S, INC.; CARIBE TIME )<br>PRODUCTS, INC.; CONTINENTAL, INC.; )<br>THE GENERAL TRADING CORPORATION; )<br>CARDOW, INC.; CASA VENEGAS, INC.; )<br>FRENCH SHOPPE, INC.; LITTLE SHOP, )<br>INC.; MR. WOODIE, INC.; CHI CHI, )<br>INC.; ST. THOMAS JEWELRY, INC. )<br>d/b/a PLACE VENDOME; H. STERN-ST. )<br>THOMAS, INC.; THEO'S INC.; and A.H. )<br>LOCKHART & CO., INC., )<br>)<br>Defendants. ) | Civil No. 1969-295 |

ATTORNEYS:

**R. Cameron Gower**
United States Department of Justice
Washington, DC
    *For the United States of America.*

### ORDER

**GÓMEZ, J.**

Before the Court is the motion of the United States to
terminate the September 8, 1970, Judgment entered in this
action.

### I.    FACTUAL AND PROCEDURAL HISTORY

On September 10, 1969, the United States filed a complaint
alleging antitrust violations under 15 U.S.C. § 3 against the

Virgin Islands Gift and Fashion Shop Association, Inc.; C. & M. Caron, Inc.; A.H. Riise Gift Shop, Inc.; Cavanagh's, Inc.; Caribe Time Products, Inc.; Continental, Inc.; The General Trading Corporation; Cardow, Inc.; Casa Venegas, Inc.; French Shoppe, Inc.; Little Shop, Inc.; Mr. Woodie, Inc.; Chi Chi, Inc.; St. Thomas Jewelry, Inc. d/b/a Place Vendome; H. Stern-St. Thomas, Inc.; Theo's Inc.; and A.H. Lockhart & Co., Inc. (collectively "the Gift Shop Defendants"). The several Gift Shop defendants each were retailers of merchandise sole in their respective gift shops.

On September 8, 1970, this Court entered a final judgment to which the parties consented. That judgment perpetually enjoins the Gift Shop Defendants from fixing or facilitating fixing the price or discounts of gift shop items. The judgment also perpetually requires the Gift Shop Defendants to report to the United States or open their books to the United States upon the United States's reasonable request. Further, the judgment contains various short-term requirements, such as requiring the Gift Shop Defendants to cancel or destroy certain price lists, discount schedules, and other materials within 30 days of entry of the judgment. The judgment also retained jurisdiction "for the purpose of enabling any of the parties . . . to apply to this Court at any time for such further orders and directions as may be necessary or

appropriate for . . . termination of any of the provisions [of this Final Judgment]." *See United States v. V.I. Gift & Fashion Shop Ass'n*, No. 1969-295, 1970 U.S. Dist. LEXIS 10335, at *10 (D.V.I. Sep. 8, 1970).

The United States now moves, pursuant to Federal Rule of Civil Procedure 60(b), to terminate the September 8, 1970, Judgment.

## II. <u>DISCUSSION</u>

"Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances[.]" *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005). Federal Rule of Civil Procedure 60 ("Rule 60") in pertinent part provides:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

A Rule 60(b)(5) motion may be granted "when the party seeking relief from an injunction . . . can show 'a significant change either in factual conditions or in law.'"

*Agostini v. Felton*, 521 U.S. 203, 215 (1997) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). Because Rule 60(b)(5) "encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances," *Frew v. Hawkins*, 540 U.S. 431, 441 (2004), the Court "should apply a 'flexible standard' to the modification of consent decrees when a significant change in facts or law warrants their amendment." *Id.* (citing *Rufo*, 502 U.S. at 393).

Relief under Rule 60(b)(6) is extraordinary because it can be given for "any other reason justifying relief." *Coltec Indus. Inc. v. Hobgood*, 280 F.3d 262, 273 (3d Cir. 2002).

### III. <u>ANALYSIS</u>

The United States indicates that pursuant to Federal Rule of Civil Procedure 60(b) ("Rule 60") it seeks to terminate the September 8, 1970, Judgment in this case.

The United States asserts that its experience enforcing antitrust laws has shown that markets evolve over time "in ways that render long-lived judgments no longer protective of competition, or even anticompetitive." *See* Mot. of the United States to Terminate a Legacy Antitrust J. at 2, ECF No. 3. As a result, since 1979, the Antitrust Division of the United States Department of Justice ("Antitrust Division") has "followed a

policy of including in each judgment a term automatically terminating antitrust judgments after no more than ten years." *Id.*

Here, the September 8, 1970, Judgment has been in effect for over 48 years. Significantly, the deadline for each short-term requirement imposed by that judgment has long-since elapsed. Additionally, the ongoing prohibitions within the judgment target only price fixing or facilitation thereof--actions already prohibited by the antitrust laws. *See, e.g.,* 15 U.S.C. § 3; *United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 489 (1950); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 720 (1944). The United States also informs the Court that the leading defendant, the Virgin Islands Gift and Fashion Shop Association, Inc., no longer exists. Given these circumstances, termination of the September 8, 1970, Judgment is appropriate. *See, e.g., United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995) (affirming a district court's exercise of equitable discretion to terminate antitrust decrees where (1) the primary purposes of the decrees--the elimination of monopoly and unduly restrictive practices--had

been achieved and (2) termination of the decrees would benefit consumers).

The premises considered, it is hereby

**ORDERED** that the motion of the United States to reopen the case (ECF No. 2) is **GRANTED**; it is further

**ORDERED** that the motion of the United States to terminate the September 8, 1970, Judgment (ECF No. 3) is **GRANTED**; and it is further

**ORDERED** that the September 8, 1970, Judgment entered in this matter is **TERMINATED**.


S\_____
      **CURTIS V. GÓMEZ**
      **District Judge**

UNITED STATES v.
ANHEUSER-BUSCH, INC. *et al*.

Civil Action No.: 1:60-cv-08906-KMM

Date Order Entered: July 19, 2019

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA,**

   **v.**          **Civil Case No. 8906-M**

**ANHEUSER-BUSCH, INC.** *et al.*,

     **Defendants**
_____

**UNITED STATES OF AMERICA,**

   **v.**          **Civil Action No. 10,422 M**

**PAUL BARNETT, INC.** *et al.*,

     **Defendants**
_____

**UNITED STATES OF AMERICA,**

   **v.**          **Civil No. 10,292**

**RYDER SYSTEM, INC.,**

     **Defendant**
_____

**UNITED STATES OF AMERICA,**

   **v.**          **No. 417-62-Civ-WAM**

**THE HOUSE OF SEAGRAM, INC.,**

     **Defendant**
_____

**UNITED STATES OF AMERICA,**

           v.                                **Civil No. 75-03087 Civ.-PF**

**CUSTOMS BROKERS AND
FORWARDERS ASSOC. OF MIAMI, INC.,**

           **Defendant**

_____

**UNITED STATES OF AMERICA,**

           v.                                **Civil No. FL-74-00078-Civ-NCR, Jr.**

**CLIMATROL CORP. and
SCREENCO INC.,**

           **Defendants**

_____

**UNITED STATES OF AMERICA,**

           v.                                **Civil No. 76-6041-Civ-JE**

**AMERICAN SERV. CORP. *et al.*,**

           **Defendants**

_____

## <u>ORDER TERMINATING FINAL JUDGMENTS</u>

      THIS CAUSE came before the Court upon the United States of America's Motion to Terminate the Judgments in each of the above-captioned antitrust cases pursuant to Federal Rule of Civil Procedure 60(b).[1]  The Government gave public notice and the opportunity to comment on its intent to seek termination of the judgments and it received no comments opposing

_____

[1] The Government filed an identical motion to terminate the seven above-captioned antitrust judgments in each above-captioned case and as such, this Order will address all of the above-captioned cases and will be filed separately on the respective dockets.

termination.  The motion is now ripe for review.

**I.      BACKGROUND**

The Government moves, pursuant to Federal Rule of Civil Procedure 60(b), to terminate seven anti-trust judgments, discussed herein.  First, in *United States v. Ryder System Inc.*, No. 10,292 (1961), a judgment was entered requiring the defendant to sell all of its interests in varying numbers of trucks and accompanying lease contracts and preventing the defendant from acquiring additional assets for three years     *See* 1:61-cv-10292-KMM, ECF No. 2.   The Government moves to terminate this judgment arguing that the judgment has been satisfied in full and should have been terminated but for the failure to include a term automatically terminating it upon satisfaction of its substantive terms.

Second, in *United States v. Anheuser-Bush, Inc.*, No. 8906-M (1960), multiple judgments were entered which included provisions enjoining the defendant from acquiring shares of stock of any corporation engaged in brewing beer in Florida and selling any brewing facility or plant. *See* 1:60-cv-08906-KMM, ECF No. 2.  The Government argues that these provisions have been mooted by subsequent statutory developments, which require that sufficiently large stock or asset acquisitions or sales be reported to federal antitrust authorities for their review.

Finally, the Government argues that the judgments in the following cases are more than ten years old and merely prohibit acts that are illegal under the antitrust laws, such as fixing prices and dividing markets: *United States v. American Service Corporation et al.*, No. 76-6041-Civ-JE (1976) (prohibiting price fixing and dividing markets); *United States v. Customs Brokers & Forwarders Ass'n of Miami*, No. 75-3087 Civ.-P (1975) (prohibiting price fixing); *United States v. Climatrol Corp. and Screenco, Inc.*, No. FL-74-00078-Civ-NCR, Jr. (1974) (prohibiting price fixing and market division); *United States v. The House of Seagram, Inc.*, No. 417-62-Civ-

WAM (1962) (prohibiting price fixing); *United States v. Paul Barnett, Inc.*, No. 10,422 M (1961) (prohibiting price fixing and selling below cost). *See* 1:76-cv-06041-KMM, ECF No. 2; 1:75-cv-03087-KMM, ECF No. 3; 1:74-cv-00078-KMM, ECF No. 2; 1:62-cv-00417-KMM, ECF No. 2; 1:61-cv-10422-KMM, ECF No. 2. Thus, the Government argues that these judgments are no longer necessary.

Accordingly, the Government moves to terminate the above-captioned judgments arguing that Rule 60(b)(5) and (b)(6) provide the Court the authority to do so.

## II.    DISCUSSION

The Government explains that, since 1979, the Antitrust Division has generally followed a policy of including in each judgment a term that automatically terminates the judgment after no more than ten years. However, this was not the policy prior to 1979 and thus, hundreds of judgments entered prior to 1979 contain no termination clause and remain in force today. As a result, the Government has implemented a program to review and, when appropriate, seek termination of these perpetual legacy judgments, including the judgments in the above-captioned cases. The Government now seeks termination of the above-captioned judgments pursuant to Rule 60(b)(5) and (b)(6).

Rule 60(b)(5) and (b)(6) of the Federal Rules of Civil Procedure provide that:

the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons. . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). The party seeking relief from a judgment, order, or proceeding bears the burden of showing that Rule 60(b) applies. *Frew v. Janek*, 780 F.3d 320, 326–27 (5th Cir. 2015) ("Consent decrees, like other judgments, may be modified or terminated pursuant to Rule

60(b)(5), which provides three independent, alternative grounds for relief. . .. As the party seeking relief, Defendants must bear the burden of showing that Rule 60(b)(5) applies.").

Rule 60(b)(5) "applies in ordinary civil litigation where there is a judgment granting continuing prospective relief, such as an injunction." *Griffin v. Sec'y, Fla. Dept of Corr.*, 787 F.3d 1086, 1089 (11th Cir. 2015). It is appropriate to grant a Rule 60(b)(5) motion "when the party seeking relief from an injunction . . . can show a significant change either in factual conditions or in law." *Agostini v. Felton*, 521 U.S. 203, 215, 237 (1997) (internal citation and quotation marks omitted) (holding that "a court errs when it refuses to modify an injunction or consent decree in light of" changes in factual conditions or in law). Further, Rule 60(b)(6) provides that the Court "may relieve a party or its legal representative from a final judgment" for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

Courts in other districts have granted the Government's request to terminate similar legacy antitrust judgments. *See, e.g.*, *United States v. Kahn's Bakery Inc. et al.*, No. 3:75-cv-00106 (W.D. Tex. Mar. 26, 2019), ECF No. 4; *United States v. Continental Grain Co.*, No. 1:70-cv-06733 (E.D. Tex. May 30, 2019), ECF No. 3; *United States v. V.I. Gift and Fashion Shop Assoc. Inc.*, No. 3:69-cv-00295 (V.I. June 11, 2019), ECF No. 4.

Here, the Government points to changes in the factual and legal landscape that they believe justify their claim for relief under Rule 60(b)(5) and (b)(6). First, the Government argues that the judgments should be terminated because of their age. In addition to age, the Government argues that the judgments should be terminated because (1) all terms of the judgments have been satisfied, (2) most defendants no longer exist, and (3) the judgments largely prohibit act that the antitrust laws already prohibit.

Given these circumstances, and pursuant to Rule 60(b), the termination of the above-

captioned judgments is appropriate.

## III.    CONCLUSION

Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Government's Motion to Terminate Judgments in each of the above-captioned cases is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this 19th day of July, 2019.

_____
K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c:    All counsel of record

# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
     Plaintiff,

         v.

IMPERIAL CHEMICAL INDUSTRIES,
(NEW YORK), LTD., *et al.*
     Defendants.

Case No. 1:20-mc-536
(Originally Civil Action No. 17-282)

## DECLARATION OF MILOSZ GUDZOWSKI

I, Milosz Gudzowski, do hereby declare and state as follows:

1.      I am an attorney admitted to practice in New York.  Since 2011, I have been employed as a Trial Attorney at the United States Department of Justice, Antitrust Division.

2.      This Declaration is being submitted in support of the United States of America's Motion to Terminate A Legacy Antitrust Judgment in the above-captioned matter.

3.      The statements made in this Declaration are based on the knowledge acquired by me in the performance of my official duties and in conjunction with factual research conducted by other attorneys and staff in the Antitrust Division.

4.      In early 2018, the Department of Justice Antitrust Division implemented a program to review and, when appropriate, seek termination of older antitrust judgments in which parties were subjected to some type of affirmative obligation or express prohibition that did not have an expiration date.  As part of this process, the Division researched the corporate status of entities subject to these older, legacy antitrust judgments.

5.      For the judgment in this case, librarians of the Antitrust Division were instructed to research and confirm the corporate status of the corporate defendants.  The librarians searched the following public sources to determine corporate status.

      a.   A search of the New York Department of State Division of Corporations database.  If the final judgment (as submitted to this Court) or other web search (see below) suggested incorporation information for a defendant in another state, the librarians also checked that state for corporate status.

      b.   A search of the Encyclopedia of Associations and IRS Tax Exempt Organization Search, where such organizations or associations were subject to a judgment.

      c.   A search of web-based resources for the existence (or succession) of the entity.  In addition to general web-based searches, the search included research in one or more of the following resources:

            i.   Lexis and/or Westlaw (news, company, and/or litigation search);

            ii.   historical newspapers from Newsbank, ProQuest, and/or Newspapers.com; and

           iii.   historical company directories held by the Antitrust Division Library.

6.      Based on the information provided to me by the librarians, I believe that Imperial Chemical Industries, (New York), Ltd., has a successor entity, Syngenta AG, which is still in business, although no longer a manufacturer of the chemicals that are the subject of the final judgment.  I contacted Stephen Landsman, Group General Counsel at Syngenta AG regarding this judgment.  On March 9, 2020, Mr. Landsman confirmed that Syngenta AG does not object to the termination of the above-captioned judgment.

Having reviewed this Declaration, I declare, under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2020        /s/  *Milosz Gudzowski*
New York, NY                    Milosz Gudzowski
                                Trial Attorney
                                United States Department of Justice, Antitrust Division
                                26 Federal Plaza, Suite 3630
                                New York, NY 10278
                                Telephone:  (646) 541-7333
                                Facsimile:  (212) 335-8023
                                Email:      milosz.gudzowski@usdoj.gov

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
    Plaintiff,

            v.

IMPERIAL CHEMICAL INDUSTRIES,
(NEW YORK), LTD., *et al.*
    Defendants.

Case No. 1:20-mc-536
(Originally Civil Action No. 17-282)

## [PROPOSED] ORDER TERMINATING FINAL JUDGMENT

The Court having received the motion of plaintiff United States of America for

termination of the final judgment entered in the above-captioned case, and the Court having

considered all papers filed in connection with this motion, and the Court finding that it is

appropriate to terminate the final judgment, it is

### ORDERED, ADJUDGED, AND DECREED:

That said final judgment is hereby terminated.

Dated: _____
February 12, 2021

      New York, NY

_____
/s/ John G. Koeltl

United States District Court Judge
Southern District of New York